The first case call for oral argument is Citizens Opposing Pollution v. Exxon Mobil Coal USA et al. Council, whenever you're ready you may proceed. We are representing Citizens Opposing Pollution. This case is about standing apparently because the trial court has denied the plaintiff standing by its decision. It is said that the plaintiff doesn't have a right to pursue a cause of action against a blatant violator of the environmental laws in Illinois because that violator got a permit and the permit allowed for the conditions that are currently at the site. Because it's a case of statutory interpretation, obviously we would look at the statute. And in Illinois, our Surface Coal Mining Land Conservation and Reclamation Act, the title itself is telling, tells us that it is declared to be the policy of this state to provide for conservation and reclamation of lands affected by surface and underground coal mining in order to restore them to optimum future productive use and to provide for their return to productive use. And then it tells you including what? And it talks about protecting groundwater. It says preventing pollution, preventing land pollution, water pollution, air pollution. It talks about striking a balance between environmental protection and agricultural productivity. The law has performance standards and these performance standards require that there be no permanent impoundments of anything but clean water. The permits anticipate the application of standards and expect the permittee to meet them. So what effect does the permit have? Well, I noticed that as well, Your Honor. I saw that the permit itself actually says, thou shalt comply with all performance standards of the statute, both federal and state, and the regulatory scheme. I would say that if I contracted with Mr. Schenzer to work for me for six months for $2 an hour, he wouldn't enforce that contract because it would be unconscionable as against public policy. If a permit is internally inconsistent and if a permit has conditions in it that are against the enabling statute that even sets up the permitting scheme, then that would be against public policy and not effective. So the standard of the permit, standard condition, comply with all law, would to me overrule any specific provisions that don't comply with that law. Are you attacking the permit or are you attacking failure to meet standards that, whether they may or may not be in the permit, violate existing statutory and regulatory law? Well, that is the issue. And the statute says that a citizen has the right, an infected person has the right, to compel compliance when they see violations of the standards in the act, or in a permit, or in a regulation, or in a rule, or in an order. And if the performance standards of the act are not complied with, then you get to compel performance through injunctive relief by a timber decided by this court says. If you have a statutory authorization for injunctive relief, you violate that statute, they've already decided, the legislature's already decided, you have irreparable harm. So in attacking the permit in that issue, this is not a permit appeal, this is not a challenge to a final decision. In fact, originally, the plaintiff had brought the case as part of the remedy and had sued ID&R for issuing illegal permits and showed all the reasons why. And the remedy was, you know, now that it's almost six months before their permit would expire, since permits last five years, we'd like the court to force them in the permit process to do it right this time, and we'd like you to tell ID&R that they have to do it right this time. And they all came in on motions to dismiss and said, well, there is no permit. It's expired. There's nothing here for ID&R to do. So we motioned to voluntarily dismiss ID&R, which the court never actually ruled on, but our amended pleadings did not allege against them. If there's no permit, then there's no reason to go back and modify such permits since it had expired. So the challenge here today is not against the permit. And how could a permit that's illegally issued, that's not consistent with the law, that's internally inconsistent, how could that permit overrule a statute? We don't allow statutes to overrule the Constitution. We don't allow regulations to overrule a statute. We certainly can't allow a permit from ID&R to overrule a statute. And what basis is the EPA brought in? Well, we brought EPA in in a rather innovative way, I think, because Illinois EPA issued a corrective action process to Exxon that was over 1,000 pages long. They've been working on it for 20 years, apparently, because they've known about their groundwater contamination a long time. And in the corrective action process, Illinois EPA issued Exxon a groundwater management zone. And a groundwater management zone is a regulatory device that allows someone to not be enforced against while they're out of compliance because they are diligently working on getting into compliance. And the reality of life is that if you violate the groundwater standards with your poisons, it is going to take you some time to remediate the contamination. You can't say, be in compliance tomorrow, and it happens. That's why we have injunctive relief. That's why we have court orders. And you compel compliance, and it happens over time. Well, in the statute that we're talking about here, the Mining Reclamation Act, it specifically states that if you are not going to reclaim the land as soon as practicable from the time you stopped mining, which was, I don't know, 1990, if you're going to get an extension of time, it has to be for a date certain. Well, there is no date certain for compliance because Exxon has a groundwater management zone that does not have an end date, that does not anticipate compliance as a groundwater management zone must do. Instead, it allows them to pump 570,000 gallons a day, 4 million gallons a week, out of the Pearl Sand Aquifer, and they no longer send it down a rubber ditch. They now send it through a pipeline into the Kaskaskia, into a mixing zone, and mix that contaminated water and the containment of the plume with other people's drinking water. So, in the overall scheme of things, if you issue and grant a 1,000-page corrective action plan that does not comply with your own standards and that causes a violation of this act, since there's no compliance and there's no date certain of that compliance, certainly not protective of groundwater to leave the source of contamination there, certainly not protective of groundwater to allow cover material that allows 85% of penetration of precipitation when the whole purpose of cover is to not allow precipitation to get into your garbage, here, hazardous materials. So, it would seem prudent that Illinois EPA needs to have their groundwater management zone declared illegal, and Exxon needs to lose that. When Exxon loses that, somebody has to help us figure out how they're going to remove what promises to be millions, possibly billions of cubic yards of hazardous material. Who would have better expertise? Certainly not Illinois Department of Natural Resources. This would be Illinois EPA. And while Illinois EPA did give Exxon a covenant not to sue for their sins, never fined them, although they sure fined farmers in that county. Even so, I believe that Illinois EPA would assign professionals who would be able to guide the court, and it would seem like in such complicated issues, the court would need guidance since we're seeking injunctive relief. Well, what's that relief? How quickly can you remove the materials? How will you solidify the materials? How will you transport the materials? Where are you going to take them? Do you have a liner? Are you going to protect the groundwater at the new location? How is this going to be done? It would seem like Illinois EPA would be the agency that could best help the court and guide them in that. But at any rate, they have themselves violated the mining act. Your count five against the EPA, is that an attack on the validity of the plan or a failure to enforce the plan they have in effect? It would be an attack on the plan itself. You cannot issue a groundwater management zone that does not timely bring the site into compliance. Exxon's own modeling shows that even if they pump the water at over half a million gallons a day for 500 years, it will still hit private wells. The source of contamination needs to be removed. And the citizens are here because they want to compel compliance. And since the statute specifically states that the post-mining land use must be the prior use prime farmland or a higher or better use. I mean, the whole purpose of this law is to restore the land after you've mined it. And since this is not prime farmland now, this is not a higher or better use than prime farmland to allow 422 acres of hazardous materials to leach into an aquifer that used to be the source of drinking water for that community. But, you know, the state subsidized hookup to an alternative supply of water so that Exxon could go on contaminating the aquifer. And while they may be exempt from requirements under the Illinois Environmental Protection Act, they are not exempt from requirements under the Mining Act. The Mining Act says restore that land to its prior use or higher or better use. The Mining Act says return the land to its natural contours. Sixty foot high, high hazard dams made out of acid-producing toxic materials known as GAAP, that would not be the natural contours. The law also says that you're not to have any permanent impoundments. This would be a permanent impoundment of something other than clean water. And the law also says that your reclamation plan is to be restorative and it is certainly to be protective of groundwater. The state and Exxon have written off this aquifer, but the people who live there have not written off this aquifer. They want their aquifer back. They want their drinking water back. They want their land unpoisoned. And they want their laws to protect them. And this law does protect them. Are you out of time in attacking the – no, no, not that time. Okay. Let me rephrase that question. You'll hear the hammer come down. In terms of attacking the EPA itself, are you out of time in attacking their judgment as to the formulation of the plan? Well, there is no appeal of a groundwater management zone. And while the Reclamation Act allows affected persons to appeal permits, the Illinois Environmental Protection Act doesn't. Coming from Illinois EPA, I can tell you that we could barely function if we had to deal with citizens appealing permits. It's hard enough that applicants appeal the conditions we put on permits. So under the Illinois EPA Act, there is no ability for a citizen to appeal a groundwater management zone. Only an applicant could appeal anything. And this isn't a permit, so even the applicant couldn't appeal it. And it's not under the Cyber Mediation Program, as Illinois EPA says in their brief. That section, again, only applicants can appeal, and it only applies to the Cyber Mediation Program, which this is not. What's your basis for having this collateral attack on the EPA, then? Okay, well, that's an interesting question. I wouldn't necessarily view it as a collateral attack, but I guess I could see how you would see that. It's because that issuance of the groundwater management zone itself allows Exxon to continue in violation of the Mining Act. And so if it allows violation, when you look at Section 805, it says that an affected citizen, an affected person, may sue a government agency or any other person to compel compliance. As long as that groundwater management zone is in place, they are allowed to pump this 570,000 gallons a day out of the aquifer in the system to contain their plume instead of remediating their contamination. Ms. Livingston, I'm going to ask you to address kind of a general statement that these claims have already been litigated, so they're barred by res judicata. Absolutely. I would say that that was probably the strongest argument that they made in the trial court, even though the trial court did not decide on that. I point out in the brief four exceptions to res judicata, which I think apply here, but even before we get to that, the first case they cited was Cordy v. Exxon. This was a personal injury case of a produce farmer across the street who suffered personal injury, rashes, coughing, things like that, from the blowing dust was the main part of the case. There was a water aspect of it, since his well was black after they started pumping their 4 million gallons a week. They somehow affected the aquifer and changed its flow. That was never proven. The case was lost, went to the Seventh Circuit. Federal court shuts its doors on the plaintiffs. And so it was adjudicated. Mr. Cordy has nothing to do with Cobb, nothing to do with me. He has nothing to do with Donnie Langenhorst. Different parties, totally different causes of action, common law, personal injury. However, I think Mr. Langenhorst was involved in some other litigation. Yes, he was. Well, he was involved in two permit appeals. One was a permit appeal for an incidental boundary. They wanted to move their rubber ditch and put it into a pipeline. And he appealed that, claiming that that was an operation, and therefore it had to be a certain distance and do certain things. IDNR found that it was not an operation, ergo why they apparently don't need to renew their permit. And so that case has nothing to do with this. The other case, he appealed the original permit modification that revised the reclamation plan and apparently allowed for these permanent impoundments, although I don't think Mr. Langenhorst actually got that. He appealed because he thought that the public notice was inadequate and the public wasn't allowed to properly participate. And he thought the plan, although I'm sure he didn't read all 1,300 pages and comprehend it in 35 days, he thought that that plan was not protective of groundwater. Obviously it's not protective of groundwater. And he appealed that. And when he got done appealing that, he appealed it to the federal agency that regulates mines. And the federal agency said, well, you know, the plan just got approved, hasn't been implemented yet, so it's premature for us to do an inspection and it's premature for us to decide the groundwater issues. So there really was no outcome that affects this case. And even if a permit appeal was on the issues of permanent impoundment, even if they had addressed the natural contours of the higher and better use, it wouldn't matter because that's an administrative decision that is under the Administrative Review Law. It's a final agency decision. But under this Act, it says in Section 810 that the remedies that are allowed in this Act, the right to compel compliance, to sue for compliance with performance standards, is not excluded or impaired by any provision of the Administrative Review Law, which was adopted four years before this law was adopted. And if you look at the Administrative Review Law, it specifically states that you must expressly adopt that Act for that Act to be applicable. Now, that Act is applicable to final agency decisions. The permit appeal process and appealing permits is entirely separate. That's regulatory. This is enforcement. A permit cannot allow a violator of the law to continue to violate. So Mr. Langenhorst was involved in these permit appeals, same party, and he did raise the issues that the Reclamation Plan was inadequate. He did raise that the groundwater was not protected. Nowhere in any cause of action has anyone, until this cause of action, raised the issue of permanent impoundments. Frankly, I don't think anyone figured it out, so we haven't found it in the rest. And nobody lived in the statute. Lo and behold, it is a permanent impoundment of something other than clean water. It would be considered hazardous waste had they not gotten an exemption from RCRA, one of the cases that they cite in here. So under Section 810, you can't impair or exclude the remedies of this Act. The remedies of this Act are that you may compel compliance if they are out of compliance. And just driving by, you know they don't have it returned to the natural contours. You know this hazardous material is not higher and better use than prime farmland. And seriously, as a matter of law, the permanent impoundments are illegal. They can't be there. So as a matter of law, and one of the exceptions to res judicata is if you have an issue of law, also if there are changing circumstances, also if there are ongoing harms. This is certainly an ongoing harm. And the same would be true with respect to collateral estoppel fine. Well? I don't think we have any further questions. All right. Well, I really appreciate that you gave us expedited review, and I appreciate your knowing how statutory interpretation goes. Obviously, statutory interpretation is to find the primary purpose of the statute. The primary purpose of the statute is to restore land to productive and optimum use. 422 acres of liquid hazardous materials sitting 10 feet above an aquifer that used to be the source of public drinking water is not a higher and better use, and it's not allowed under the law. And we cannot allow a permit that Exxon was able to obtain, so we all know how well we should trust ID&R, to overrule the statute and the performance standards in that statute. Thank you. Thank you, counsel. Counsel? Excuse me. You've shown these to opposing counsel? Yes. Okay. Okay. I think they're stable. Go ahead. May it please the Court, my name is Peter Strassner. I'm here today on behalf of ExxonMobil Coal, the Monterey Coal Company. The plaintiff said this case is about standing. I submit to you it is not about standing. We have not actually challenged standing. We probably need to do some discovery in this case to do so. The plaintiff said we have written off the aquifer. Nothing can be further from the truth. My client has spent millions of dollars trying to protect the aquifer and contain the impacts, which we do not dispute, but contain the impacts to the mined property. Now, the plaintiff made a number of other characterizations with which we could not disagree more. But what I want to say is that I submit to you this case is really about whether or not you can make a collateral attack on a permit using the citizen suit provisions of the mining law. When that collateral attack comes after the time for administrative review has run, when it comes after the same challenges were rejected in two administrative proceedings, one at the state level, one at the federal level, long after the time to appeal the agency's decision has run, and long after, and I think this is very important, long after Monterey, in reliance on its permits and in fulfillment of its permit obligations has not only commenced but actually completed a two-and-a-half-year construction project that involved thousands and thousands of man hours and an investment of over $28 million. The trial court, as you know, said that this case could not go forward because it was barred by the administrative review law. In fact, this case was barred on June 29, 2005, over three years before the citizen suit provisions were invoked in this case. Plaintiff's first complaint included the IDNR, the Illinois Department of Natural Resources. That's the main state agency in charge of mining in Illinois, as you probably know. In that original complaint, it sought to invalidate the permits, the revised permits, and to require a new reclamation plan to replace the one that was incorporated into the permits that Monterey got. The counts, Monterey in that original complaint, were the very same counts that you see today and the same counts that were asserted against IDNR. All parties moved to dismiss that claim under the administrative review law, and several other theories. Plaintiff sought and was granted leave to amend. In so doing, it dropped IDNR out of the case. It removed the word permit from his pleadings, but it continued to attack the terms of the permits. I think that's a very important thing to understand in understanding this case. The counts against Monterey did not change significantly. The same relief was sought. It is the invalidation of the reclamation plan. Plaintiff itself admitted that the changes between the two were simply nuances. But in the course of briefing those issues, plaintiff made some very important and, I think, relevant admissions. I see that our thing is falling down here, but I will refer you to the first two in particular, because those two admissions, can you see them from where you are? In those two admissions, what plaintiff has said is that when you're attacking, and I heard it again today, when you're attacking a permit, you've got to do so under the administrative review law. There's no ifs, ands, or buts about that. Plaintiff conceded the point. In fact, he conceded that his claims against IDNR were barred, and not just because the permits had expired, but because the time had run to attack those permits. Now, what plaintiff is suggesting today is that it can bring the exact same claims against Monterey with respect to the permits under the citizen suit provisions. Now, I'm trying to understand. The reclamation is ongoing, correct? The construction of the reclamation is substantially complete, but obligations with respect to several aspects of the reclamation are, in fact, ongoing. And those are part of the terms of the permit? Yes. And who has the oversight to make sure that that's in compliance? There are several agencies conducting oversight. The IDNR, for example, has an engineer that inspects the RDA every single month. In addition, our engineers inspect and have to certify that the RDA continues to comply with the requirements of the permit. And if you were to attack that aspect of the reclamation, that would be after the permits? See, I'm trying to understand. Well, I think the distinction that you're going for here is one that the circuit court judge understood very well. He asked the plaintiff point blank, are you attacking their performance of the permit? And the plaintiff handedly admitted, and I think I heard it here today as well, that no, I'm not attacking the performance of the permit. Monterey has done what it is required to do, is doing what it's required to do under the permit. What plaintiff is doing, and I think that this second chart here illustrates it very well. What plaintiff is doing is saying the terms of the permit were illegal. Now, we perfectly disagree with that, okay? The point here today is that the time for bringing that challenge is wrong. In fact, the challenge was brought. Mr. Langenborsch brought that challenge against Monterey with respect to the permit terms. And, by the way, he did argue that we weren't protecting the groundwater adequately through the corrective action plan. He did argue that the land had not been returned to its final contours sufficiently in compliance with the act. He did make the other two arguments as well, that the refuge disposal areas should not remain on site, i.e., that's the permanent impoundment argument. And he did argue that the post-reclamation land use was not acceptable. This is a very complicated matter for us to understand, and we don't have the record yet. So, you know, we're at a bit of a loss as far as a lot of the specifics. But let's just take the permanent impoundment. Are you telling me that the terms of the permit allow for permanent impoundment? I'm just taking that as an example. The permanent impoundment claim, as I understand it, is that there is too much water, the plaintiff believes, in the RDA. These RDAs, by the way, are all over the state of Illinois. There's like 60 of them or something like that. This is nothing unusual. They don't typically have impermeable covers. They will have water in them. They all do. The question is, how much drainage adequate? We did put in some additional drains. We've got tow drains that comply with the RDAs. We've removed lakes from the RDAs. We did all these steps that IDNR required of us to make sure that the RDAs would remain stable as they are today, notwithstanding the allegations to the contrary, and, in fact, comply with the permit terms. Now, help me with your question one more time. No, I think you've answered it. I don't know if I've answered it or not. So what you're telling me is that the permanent impoundment, the issue of permanent impoundment, is one that was addressed in the permit. Absolutely, because the issue is how much water is too much water and so forth, what drainage is adequate. That's all part of the reclamation plan, and the reclamation plan allows that there be moisture in the RDAs. It just requires that they be covered with topsoil. It specifies how much topsoil. It specifies line amendments so that you don't get acid drainage out of the RDAs. It takes all kinds of precautions. It's a very complicated plan. Yes, it is, but that's the reason that you require scrutiny of these plans up front so that when somebody goes and performs, as my client has done here, you don't get second-guessed after you've made a huge investment. If that were the case, I don't know that anybody, if you could do that, that anybody, whatever, would want to do coal mining in the state of Illinois. But how does one enforce performance for a reclamation once the permit is in place? That's a good question. The trial court, again, asked if performance was being challenged. The plaintiff said no. But how would you do it? Let's say, for example, that the final contours of the performance of the reclamation plan generally was at issue because we have certain operation and maintenance obligations. If we didn't maintain the slopes on the RDAs and they eroded and they became a danger, then we have an obligation under our permit to do that, and those obligations, I think it's under the test to survive the expiration of the permit itself. Those are ongoing obligations. If we didn't maintain our slopes, theoretically, plaintiff could bring the citizens to suit action for failure to comply with the permit. But that's not what's being brought here. The case that's being brought here is against the permit itself. It's challenging the conditions that were approved in the permit. It's not the first case to do so. We cite a litany of cases on pages, I believe it's 26 through 28 of our brief, in which collateral attacks were made to permits under circumstances similar to this one. And in each and every one of those cases, the courts saw through what was going on and said, no, this is not just a condition, an ongoing condition, as plaintiff likes to describe it, or a performance standard. What you're really saying, what you're really doing is taking issue with the permit decisions. You disagree that the IEPA or the IDNR could have approved the final contours. You don't think that that complied with the law, and we think it does comply with the law, but the point is, when do you challenge it? The plaintiff did challenge it. The plaintiff simply chose not to appeal to the circuit court in a timely fashion. In fact, the plaintiff chose to bring this action over three years too late. I'd like to also say a few words about plaintiff's construction of Section 810 of the mining law. That section reads, all final administrative decisions of the department under the Act shall, and I want to stress the word shall, be subject to judicial review pursuant to the administrative review law. As the plaintiff correctly notes, to say except that the remedies created by this Act are not excluded or impaired. Now, it uses the term remedies. I would first like to note that the remedies the plaintiff is seeking in this lawsuit are the same remedies that it sought at the administrative level. Requiring administrative review does not deprive plaintiff or impair plaintiff with respect to any remedies available to it. The same remedies are available to it. It simply prescribes the procedure pursuant to which those remedies must be sought. Second, plaintiff's reading would take the word shall right out of Section 810. In other words, the exception would swallow the rule under their reading. It would, in essence, make administrative review permissive because you wouldn't have to do it that way. You could simply bring a citizen suit down the line, and there would be, by the way, no limit whatsoever as to when you could bring that citizen suit. You could bring it 50 years after the permit was passed, 100 years, and so forth, because under plaintiff's reading, there is no word shall in that, in Section 810 of the Mining Act. Well, you just said that your duties to maintain certain aspects of this permit continue after the term of the permit expires. So isn't that an ongoing situation that would allow a citizen's action? I'm sorry. I'm sorry. That since you have a continuing performance duty, despite the expiration of the permit, wouldn't you have an ongoing duty on which you could be challenged as to performance? Yes. Okay. But that's not what's going on here. We're not being challenged. Our permit performance is not being challenged. In fact, just the opposite, the plaintiff has conceded that we've done what the permit requires us to do. We're doing what the permit requires us to do, and if you look at the amended complaint, there's nothing in there that says the minor raise permit requires us to do X, and it's not doing X. If you take the position that your permit has that you are fulfilling the duties required of you by the permit, whether it's active or expired, and a citizen's suit is filed saying you are not performing duties required of you by the act, the one doesn't preclude the other, does it? The act is superior. I think you'd have to look in that circumstance at exactly what the allegations are. The allegation in this case is about these four or five, four complaints that plaintiff has with the reclamation plan. What plaintiff is seeking is a new reclamation plan. They want you to throw out the old one and bring in another reclamation plan, which comports with rather than what IDNR thinks is appropriate, what plaintiff thinks is appropriate. Well, that's not what I asked. Okay. You've got the, let me try this again. We've got X duties under the permit, and these duties are ongoing whether the permit is still in its active stage or has expired. If a citizen's suit is filed alleging that you are violating Y duties of the act, the existence of these duties under the permit do not preclude the obligation to perform the duties enumerated by the act, do they? Are you talking about additional duties that address items that are not covered in the permit? Either that or duties that arise because of actions taken under the permit that cause what a citizen's suit claims is a violation of the art, a violation of the act, both of them. My answer would be that as for matters that are covered in the permit, a citizen's suit would not lie. Okay. In other words, if you're complying with the permit, those terms, you can't challenge those terms through a citizen's suit. If you are talking about the terms. I'm not talking about the terms. I'm talking about the actions taken under the permit or the results, the sequelae of actions taken under the permit. And my answer is that if it's an action that does not relate to the permit requirements but is something additional or inconsistent with the permit requirement, there may be a citizen's suit in that situation. However, again, in this case, things that plaintiff is alleged are all things that were conditions that were created by the permits themselves. And the Monterey, once it got that permit, had no choice but to fulfill its obligations under the permit. Once the permit is issued, it's not discretionary on our part anymore. No, I understand that. I understand that. Am I out of time here? I think you are. I don't think we have any further questions. Thank you. Thank you. Thank you, counsel. Thank you. May it please the court, counsel Brian Carroll, assistant attorney general on behalf of the Illinois Environmental Protection Agency. Could you address, and I'm getting right off track here, but the fact that there's the contention that there's no date certain with respect to one aspect of the reclamation, and it's required under the act, or at least that's her allegation. Again, I think that's her allegation, and maybe I'm going to have to answer this sort of by tying this into my opening argument. I don't want you to think I'm evading the question. No, if that would work better for you, just go ahead. I mean, one of the essential problems here with plaintiff's case against the Illinois Environmental Protection Agency is that its involvement in this case is to create what's sort of an interim action, or at best you could call it an interim decision maker. It formulated this corrective action plan to address the problems with the groundwater under the mine. It did that. It then takes this corrective action plan and puts it in the, this then goes to the IDNR, and the IDNR is the party, the agency that decides does this corrective action plan comply with the Mining Act or does it not comply with the Mining Act, and if it doesn't, the IDNR can send it back for more work to the EPA. In this case they didn't, so the corrective action plan, whatever its alleged fault, was approved by the IDNR. And the IDNR then issued the permit. Now, essentially Cobb's allegation is that this is a bad permit. But is there a remedy for a bad permit? Yes, it's take your action in administrative review. And Mr. Langenhorst and others did that. They sought administrative review. They sought administrative review before the IDNR. In the context of this administrative review, they not only had the opportunity, but in fact did raise all of the groundwater remediation problems. What the IDNR did found was, and I think when you do look at the record, I think it's important to focus on Exhibit D because this is the IDNR's. Exhibit D. Exhibit D. This is Monterey's Exhibit D. This is the Order on the Party's Cost Motion for Summary Judgment. And the issue, this is what the hearing officer says. He says, the issues to be heard in this matter include whether the proposed remediation plan for the gob pile adequately addresses the contamination of the aquifer. That's on the opening page. On page 6, under groundwater issues, he says, this is his finding. He says, the petitioners under expert witness have admitted the revision as approved prevents material damage to the hydrologic balance outside the mine property and minimizes the disturbance of hydrologic balance within the boundaries of the mine. This satisfies the regulatory requirements. It requires a finding summary judgment in favor of the department. By that department, they're referring to IDNR and Monterey, the mine. So the issue of whether this corrective action plan permit complies with the law has been addressed. And it was addressed in the administrative hearing. And at this administrative hearing, the parties had not only the opportunity to raise the groundwater issue. If you look at the DNR's regulations, particularly it's 62, 1847.3, I believe it's involved. Sorry, 1847.3, Permanent and Related Hearing. A party to an administrative hearing can raise the issue of whether the permit application fails in some manner to comply with the applicable requirements of the state act or revenues. So if there's a problem with the merits of the corrective action plan, if it didn't have an end date, as they allege, if it didn't meet the proper standards of the mining act, these were all matters that could have been raised in administrative proceedings. Many of them were, in fact, raised. So this is, at this point, this is not only, this is at least the parties behind COP. And again, the council doesn't really contest the privity requirements of race judicata. This matter has been litigated over and over and over. And at this point, anything that's going to be a collateral attack is going to be barred by race judicata. Again, you know, I can only reiterate what Councilor Permanteau raised over the construction of sections 8.5 and 8.10 that handle the citizen suit, whether that can be used to collaterally attack the administrative permit and administrative findings. Again, the two provisions have to be read in harmony. The exception, the citizen suit exception has to be read narrowly. And the way a plaintiff wants to read the statute, the exception would swallow the rule. There's no basis to read the statute as the plaintiff would wish to read it. And for that reason, the district court's decision should be affirmed. Thank you, Counsel. Counsel? The remedies are not the same at all. The remedies in a permit appeal are to change the conditions of the operation as it proceeds. They weren't even in operation when they modified this permit. So you're not, you're, I heard from both Monterey and the EPA that essentially you are not challenging the performance of the reclamation. We are not challenging the performance of their permit. We are challenging their performance of reclamation that complies with the standards that are in the statute. When they say that it says shall, and we're ignoring shall, shall applies to administrative decisions. This isn't an administrative decision. We're not here challenging their permit. It just so happens, and it's a red herring here, that the permit allows them, the permit they applied for, that they proposed, that they wrote, that I did not put their little stamp on, that permit happens to be illegal and does not comply with the performance standards of the Act. They want blanket immunity from the performance standards of the Act because they got a permit from ID&R that allows them to violate the law. If you look at the language in this court's old Venn case, Justice Goldenhirsch quotes Judge Foreman in a federal case where he says, defendant would now have the court interpret these provisions to reach the unreasonable result of authorizing it to ignore performance standards, merely because the Department of Mines and Minerals is delinquent in processing permit applications. Here, they're delinquent in allowing violations of the Act in their permits that they grant to people who apply for them. The remedies are not the same at all. In a permit appeal, can you compel compliance? You absolutely cannot. That is the court of equity. Micah Timber. We have to go to court. There is a role for the courts to play. And what the trial court has done here is deny itself the right to review what is going on in its community when they say that the remedies are the same. No way. Enforcement versus regulatory. And they say, oh, what they want the court to do is to replace ID&R's judgment with the plaintiff's judgment. No, we want the opportunity to show the trial court that they are out of compliance with performance standards that are not discretionary, they're not suggestive, they're mandated under the law, and that law is backed by the Illinois Constitution. In 1970, in the era of let's protect the planet before it melts, we all decided, we had great people that worked on these causes, and they decided that we needed a constitutional amendment in Illinois to have the right to a healthful environment. And it's the policy of this state to protect the environment for this and future generations. The future generations in Germantown can't drink the water because Exxon has illegal permanent impoundments of flowable material that's not clean water that's being impounded by high-hazard dams. They have not returned and restored the land to the natural contours or to its higher or better use or prior use. They have not protected the groundwater, and they never will. They are pumping their plume and sending it to the Kaskaskia. They are not removing the source of contamination. And this court would be remiss if it interpreted the statute out of the statute and gave them the right to have some blanket immunity because they got a permit. A rep can't overturn a statute. A statute can't overturn the Constitution. How can a permit overturn a constitutional right to a healthful environment that is backed not only by performance standards in a statute, but is backed by a private right to compel compliance? Apparently, the legislature was quite aware of the checkered history of mines and minerals. And when they talk about how this was already decided and that the lay people in their depositions said that the hydraulic balance wasn't affected, this tells you about the administrative process. These unrepresented people did not know what they were doing in a permit appeal. This isn't a permit appeal. This isn't we want to talk about how you're going to operate your mine. This is about we want to talk about how you're going to leave your land. This is not about permit conditions. This is about site conditions. And the law says we have the right to compel compliance. And if you remember what the Office of Surface Mining said in the permit appeal from IDNR, it went to the feds. And what did the feds say? They said OSM agrees that the hydraulic balance has been affected. OSM agrees with the Alton Field Division that until the corrective action plan is fully implemented and its effectiveness assessed, any action by OSM, including an inspection at this time, would be premature. We're not asking that you hear about the permit. We're asking that ongoing violations be remedied. And if ongoing contamination cannot be remedied, then the law has no meaning. And under statutory interpretation, your first and primary goal is to find the intent of the law and to give it meaning. Thank you, Counsel. You're welcome. We appreciate the briefs and arguments.